IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 2:16-cr-20054-JTF |
| | ) |
| JASON HENDERSON, | ) |
| | ) |
| Defendant. | ) |

**ORDER ADOPTING THE MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION**

Before the Court is Jason Henderson's ("Defendant") Motion to Suppress filed on July 22, 2016. (ECF No. 22). On July 27, 2016, this Court referred this motion to Chief Magistrate Judge Diane K. Vescovo for report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). (ECF No. 23). The Magistrate Judge issued a Report and Recommendation on Defendant's Motion to Suppress on December 8, 2016. (ECF No. 43). Defendant filed objections to the Magistrate Judge's Report and Recommendation on December 22, 2016.[1] (ECF No. 44). After a *de novo* review, the Court finds that the Report and Recommendation should be adopted.

**STANDARD OF REVIEW**

The Court may refer a motion to a suppress in a criminal matter to a magistrate judge for the purpose of conducting an evidentiary hearing and to submit proposed findings of fact and recommendations for the disposition of the motion. 28 U.S.C. § 636(b)(1)(B). The Court must "make a *de novo* determination of those portions of the report or specific proposed findings or

---

[1] Defendant filed a Supplemental Memorandum in Support of Objections to the Magistrate's Report and Recommendation on Defendant's Motion to Suppress on February 11, 2017. (ECF No. 48).

recommendations to which objection is made." 28 U.S.C. § 636(b)(1)(C). However, the Court is not required to conduct a *de novo* evidentiary hearing as part of its *de novo* review. *United States v. Raddatz*, 447 U.S. 667, 674 (1980). After reviewing the evidence, the Court is free to accept, reject, or modify the proposed findings or recommendations of the magistrate judge. 28 U.S.C. § 636(b)(1)(C).

## **FACTUAL HISTORY AND REVIEW**

On October 16, 2015, Officers Aaron Putman ("Officer Putman") and Michael Bartlett ("Officer Bartlett") were patrolling the Airways Boulevard Precinct. The officers were traveling in separate, marked police vehicles. Around 9:00 p.m., Officer Putman observed a red vehicle with two passengers, both in the front seats, turning right off Hemlock Street onto South Parkway, heading east. Officer Putman indicated that the street, from which the vehicle came, Hemlock, was a high drug and high crime area: "there is just a lot of crime on that street, a lot of heroin, cocaine…. and marijuana as well." The drug crimes included both use and sale of drugs. Officer Putman testified that he observed that the red vehicle had a cracked front windshield, obstructing the driver's view and creating a prism effect from oncoming traffic. Subsequently, Officer Putman pulled over the red car at the corner of South Parkway and Willett Street, in front of a small convenience store.

After the car came to a stop, Officer Putman testified that he approached the driver's side on foot, while Officer Bartlett approached the passenger's side on foot. Officer Putman stated that once the Driver, later identified as Miller, rolled down her window, he smelled a "faint odor of marijuana" coming from inside the vehicle. Later, Officer Bartlett, too, testified that he smelled that faint order of marijuana from his vantage point on the passenger side of the vehicle. Officer Putman did not see anything in plain view, but he testified he was concerned about his

safety because drugs and weapons go together. Based on his experience in dealing with drugs on the streets, Officer Putman knew that occupants often have guns in the car. Officer Putman asked Miller to provide her driver's license. After Miller complied with his request, Officer Putman asked her to exit her vehicle. They both walked over to Officer Putman's patrol car and engaged in conversation. Eventually, Officer Putman obtained consent from Miller to search her vehicle.

A video recording of a portion of the stop was introduced into evidence during the suppression hearing. When started, the video shows that the driver of the vehicle is already out of the vehicle and is conversing with Officer Putman. Officer Bartlett is already on the passenger side of the vehicle, ostensibly watching the passenger. Obviously, that which transpired prior to the start of the video is not shown. Although no hand or body signal is visible on the portion of the video recording showing the stop, Officer Bartlett, in some way communicated to Officer Putman his concern about the passenger, that "something was wrong." Officer Bartlett testified that Defendant repeatedly "kept moving around and would look over to the center console and he would come back to himself. Then he would like just readjust himself in the seat and then look back, and he just kept looking back at us, seeing what we were doing, where we were….I was just like – he seem nervous." Officer Bartlett indicated that Henderson's actions gave him cause for concern, because Henderson "could grab a weapon-he was free to do anything at that point."

Officer Bartlett asked Defendant to exit the vehicle and passed him to Officer Putman to be patted down. When Defendant exited the vehicle, he had his hands in the air. Officer Putman then instructed Defendant to walk behind Miller's vehicle. Officer Putman then placed his right hand on Defendant's back or shoulder to guide him to the correct spot on the vehicle for a pat-

down. He also asked Henderson to place his hands on the back of Miller's vehicle. Before Officer Putman was able to perform a pat-down, Defendant spun off the car and ran. After Defendant had taken approximately two steps, Officer Putman saw and heard the gun fall to the street. Eventually, Officer Bartlett apprehended Defendant.

Defendant makes several objections to the Magistrate's findings of fact. First, Defendant states that the Magistrate erroneously found that Officer Putman identified the passenger as Henderson. Defendant argues that there was no testimony that he ever identified the passenger as Mr. Henderson during the traffic stop. The Court does not understand this objection, and can only speculate as to its meaning. The Magistrate Judge did not find that the officer knew and identified Henderson at the time of the traffic stop. The Magistrate Judge only found that Officer Putman identified the passenger as Henderson. This is verified in Putman's testimony at page 15 where Henderson was identified during hearing.

Second, Defendant states that the Magistrate erroneously found that the video depicted the sequence of events described by Officer Bartlett and Putman. Defendant states that both officers testified that Officer Bartlett gave Officer Putman a physical signal because Defendant kept moving around. Defendant asserts that upon cross examination, Officer Bartlett changed his testimony as to the physical signal. However, nearly everything the officers testified to is verified by the video recording. Defendant adds that the testimony of the driver contradicts the Officer's testimony because she never heard either Officer ask Mr. Henderson any questions. Again, the Court does not understand the import of Henderson's reference to the driver's testimony. In this regard, the Court notes that Ms. Miller was never asked if the Officers ever spoke or communicated with each other during the stop.

Next, Defendant states that the Magistrate erroneously found that Officer Bartlett testified that he took Defendant's identification and ran it on his PDA. Defendant asserts that if Officer Bartlett had run Defendant's identification on his PDA, he would have known that Defendant was a convicted felon. Thus, Defendant asks this Court to speculate as to what information, if any, the Officer should have obtained. The Court declines the offer to engage in such speculation.

Finally, Defendant asserts that the video fails to corroborate any of Officer Bartlett's testimony as to Defendant's alleged nervous behavior. This observation is true and accurate, since during most of the video recording, the passenger door of the vehicle is closed.

Defendant concludes his factual objections by stating that the "Magistrate's determination of credibility of the officer to the exclusion of every other witness and exhibit in this case is contradicted by the video evidence and supported by a single post-hoc rationalization that, because the officers found marijuana on Mr. Henderson, then all of their testimony must be true." Defendant requests that this court reject the Magistrate's findings of fact and hear the matter *de novo*.

After a review of the Magistrate Judge's factual findings, the Suppression Hearing transcript, the exhibits from the hearing and Defendant's factual objections, the Court finds that Defendant factual objections must be overruled. It is clear that the Magistrate Judge's factual findings are based upon the evidence presented during the suppression hearing. The Court accepts and adopts the Magistrate Judges' factual findings as well as her conclusions about the Officers' credibility. The Defendant urges this Court to conclude that the Officers' testimony is unreliable. Defendant points to several inconsistencies in the Officers' testimony, and argues that they are so egregious as to render their testimony incredible. The Court is not surprised that

there are a few inconsistencies between the Officers' testimony, and would be surprised if there were none. However, after reviewing the entire record, including the entirety of all testimony and the video recording, the Court finds that the inconsistencies identified by Defendant are insignificant and are of little or no consequence. Further, there is no need for this Court to conduct a *de novo* evidentiary hearing.

## LEGAL ANALYSIS

Defendant contends that the Magistrate Judge made three legal conclusions. These legal conclusions are: 1) there was a legal traffic stop in this matter; 2) the scope of the traffic stop did not violate the Fourth Amendment as the request for Mr. Henderson to exit the vehicle was a *de minumus* intrusion on his personal liberty and because Ms. Miller had given Officer Putman consent to search the vehicle; and 3) Mr. Henderson was not frisked, but even if he had been, the frisk was justified under the Fourth Amendment. (ECF No. 44 at 6). Defendant states "without conceding his objection to the first two legal conclusions, Mr. Henderson's objections will focus on the Magistrate's third legal conclusion in this matter." (*Id.*)

The Sixth Circuit has emphasized that objections are to be specific in order to narrowly focus the district court's attention on the dipositive and contentious issues. *Howard v. Sec'y of Health and Human Servs.*, 932 F.2d 505, 509 (6th Cir. 1991) (citing *Thomas v. Arn*, 474 U.S. 140, 148 (1985)) ("The requirement of objections permitted the district court to focus attention on those issues…that are at the heart of the parties dispute…thereby preventing the district court from being 'sandbagged' by a failure to object.") Without a specific objection, it is difficult for the Court to determine how the Magistrate Judge's Report and Representation misrepresented the facts of this case or what cause or issue the Plaintiff could find objectionable. The failure to identify specific concerns with a Magistrate Judge's report and recommendation allows the

6

party's objection to be deemed a general objection, or a failure to object entirely. *McCready v. Kamminga*, 113 F. App'x 47, 49 (6th Cir. 2004) (citing *Howard*, 932 F.2d at 509).

As Defendant's legal objections only focus on the Magistrate Judge's third legal conclusion, this Court's order will do the same. However, the Court finds that Henderson's objection to the first two legal conclusions of the Magistrate Judge, legality of the traffic stop and Henderson's removal from the vehicle, are deemed general objections and are **Dismissed.**

**Whether Defendant was Searched**

The Magistrate Judge determined that Defendant was not frisked because:

Officer Putman guided Henderson to the back of Miller's vehicle and placed his right hand on Henderson's back to take control of the situation for safety reasons and in order to position Henderson for a pat-down. Henderson stepped out of the vehicle with his hands up and Miller was standing behind Officer Putman. Officer Putman testified that both of these facts posed concerns for officer safety. Officer Putman was about to pat-down the outer surfaces of Henderson's clothing when Henderson turned, ran away, and the pistol dropped to the ground. Officer Putman did not frisk Henderson before he ran, and Officer Putman's discovery of the weapon was not the result of a frisk.

(ECF No. 43 at 15-16).

The Magistrate Judge reasoned that the Supreme Court in *Terry v. Ohio*, 392 U.S. 1, 19 (1968) held that a defendant is searched when the police officer "[takes] him and pat [ ] down the outer surfaces of his clothing." However, Defendant contends that this conclusion ignores the law cited by him during the hearing that directly addresses the particular facts of this case. Specifically, Defendant asserts that the United States Supreme Court clearly stated that police officers are not permitted to even touch a person unless that police officer has reasonable suspicion that the person is armed and dangerous. *See Sibron v. United States*, 392 U.S. 40 (1968).

7

In *Sibron*, the defendants were both convicted of crimes on the basis of evidence seized from their persons by police officers, and argued that N.Y. Code Crim. Proc. § 180-a, which authorized the search and seizures, was unconstitutional on its face. *Id*. at 59-62. Ultimately, the Court found that the officer was unable to point to any particular facts from which he could reasonably infer that Sibron was armed and dangerous, but the specific portion of the Court's opinion that Defendant now relies on states:

> The police officer is not entitled to seize and search every person whom he sees on the street or of whom he makes inquiries. **Before he places a hand on the person of a citizen in search of anything**, he must have constitutionally adequate, reasonable grounds for doing so.

*Id*. at 64. (emphasis added).

There was no dispute in *Sibron* that a search had occurred. As a result, the Court did not address the threshold issue presented in this case – whether the police officer's conduct constituted a search. Furthermore, the portion of the *Sibron* Court's opinion that Defendant relies on is "not a holding that a search occurs whenever an officer 'places a hand on someone'…. Instead, the Supreme Court was merely expounding upon its general admonition in the sentence immediately preceding the quoted one that '[t]he police officer is not entitled to seize and search every person whom he sees on the street or of whom he makes inquiries.'" *United States v. Moore*, 390 F. App'x 503, 515 (6th Cir. 2010) (Griffin, J dissenting) (citation omitted).

Defendant also claims that there is no legal distinction between a pat-down and an attempt to pat someone down for *Terry* purposes. Defendant states that in each case where there was an attempt, the motion to suppress was not decided on the basis of whether there was an attempt to pat-down or an actual pat-down. *See United States v. Fisher*, No. 99-5979, 2000 U.S. App. LEXIS 22214 (6th Cir. Aug. 21, 2000); *United States v. Meadows*, No. CR-1-07-014, 2007

8

U.S. Dist. LEXIS 67786 (S.D. Ohio Sep. 13, 2007); *United States v. Fuller*, 120 F. Supp. 3d 669 (E.D. Mich. 2015). However, Defendant asserts that the Sixth Circuit in *Moore* determined, as a matter of law, that when an officer physically touches a person and has the intent to search them – the search has begun. *Moore*, 390 F. App'x at 509.

In *Moore*, the defendant moved to suppress the drugs seized from his person following a traffic stop. *Id*. at 503. The traffic stop occurred after a police officer received word that a car fitting the description of the car carrying defendant contained crack cocaine. *Id*. The officer received permission from the car's driver to search the car but failed to locate any drugs. *Id*. The *Moore* district court found the following additional facts:

> After searching the vehicle, the officers had not been able to find any controlled substances, firearms, or money, but the officers noticed that the carpeting was lifted up on the passenger side and that the lining of the back seat was held up with a safety pin. Officer Lewis approached the defendant and asked him once again if he had any of those items on his person. Again, the defendant said no. At that point, Officer Lewis told the defendant to place his hands on the hood of the patrol car and to spread his legs. The defendant began to comply with Officer Lewis's request, but then turned and tried to flee. After he was taken down only a few feet away, the crack cocaine was found in his pocket. He and Ms. Moore were arrested.

*Id*. at 505.

Here, the Magistrate Judge found that "Officer Putman guided Henderson to the back of Miller's vehicle and placed his right hand on Henderson's back to take control of the situation for safety reasons and in order to position Henderson for a pat-down…. Officer Putman was about to pat-down the outer surfaces of Henderson's clothing when Henderson turned, ran away, and the pistol dropped to the ground." (ECF No. 43 at 15-16). Although the surveillance video does not show the pistol dropping to the ground, the video corroborates the Magistrate Judge's findings.

Accordingly, this Court adopts the Magistrate Judge's finding that Defendant was not searched. Officer Putman had the intent to pat-down Defendant, but an actual pat-down had not begun. The Sixth Circuit, in reaching its decision, in *Moore* stated that:

> [w]e agree with the district court that, as a matter of law, the search began when the officer physically positioned Defendant on the hood of a police car by grabbing his shirt, instructed him to spread his legs, and then physically touched him on his side, **presumably in an attempt to uncover contraband or a weapon**. Officer Lewis intent to search was apparent, and the physical contact clearly indicates that the search had begun.

*Moore*, 390 F. App'x at 509 (emphasis added). It would be easy for this Court to cite *Moore* and find that a pat-down of Henderson had already begun when he bolted. However, the instant case is distinguishable. In *Moore*, the officers had received information that drugs were in the car. After searching for approximately forty minutes, no drugs were found. In those forty minutes, the defendant was cooperative and exhibited no signs that he was a danger to the officers. In the case at hand, Henderson was removed from the vehicle, and the pat-down was to occur prior to the officers searching the car. The surveillance video shows the officer positioning Defendant prior to a pat-down, not physically touching him in an effort to uncover contraband. Thus, there was no contact that clearly indicated that the search had begun. *See Bond v. United States*, 529 U.S. 334, 338 n.2 (2000) ("[T]he issue [in determining whether an officer's actions violate the Fourth Amendment] is not his state of mind, but the objective effects of his actions").

**<u>Whether the Officers had a Reasonable Suspicion</u>**

Even if this Court found that the police officer's conduct amounted to a frisk, the frisk of Defendant did not violate his Fourth Amendment rights. The Magistrate Judge stated that the authority of a police officer to stop and frisk a passenger in a motor vehicle temporarily seized upon police detection of a traffic violation, was confronted in *Arizona v. Johnson*, 555 U.S. 323, 327 (2009). In this case, the Court held:

10

> [I]n a traffic-stop setting, the first *Terry* condition – a lawful investigatory stop – is met whenever it is lawful for police to detain an automobile and its occupants pending inquiry into a vehicular violation. The police need not have, in addition, cause to believe any occupant of the vehicle is involved in criminal activity. To justify a pat down of the driver or a passenger during a traffic stop, however, just as in the case of a pedestrian reasonably suspected of criminal activity, the police must harbor **reasonable suspicion** that the person subjected to the frisk is armed and dangerous.

*Id*. at 327 (emphasis added). "Reasonable suspicion is based on the totality of the circumstances, and it exists if a reasonably prudent person in the circumstances would be warranted in the belief that his safety his [or her] safety or that of other was in danger." *United States v. Noble*, 762 F.3d 509, 521-22 (6th Cir. 2014) (citations omitted). This standard is objective. *See Terry*, 392 U.S. at 22 (internal quotation marks omitted) ("If subjective good faith alone were the test, the protections of the Fourth Amendment would evaporate, and the people would be secure in their persons, houses, papers, and effects, only in the discretion of the police."). Furthermore, the Sixth Circuit

> determines if officers had a reasonable, articulable suspicion of danger based upon an examination of the individual factors, taken as a whole, and whether give rise to reasonable suspicion, even if each individual factor is entirely consistent with innocent behavior when examined separately. We often examine individual facts in an orderly fashion and include a brief discussion of each factor and its weight in the analysis. In doing so, however, we must take care not to artificially isolate them and mistakenly subvert a legitimate totality-of-the-circumstances review.

*United States v. Shank*, 543 F.3d 309, 314-15 (6th Cir. 2008) (internal citations and quotation marks omitted).

Defendant makes several arguments as to why the officers lacked reasonable suspicion, which include: (1) Officers could not attempt to pat-down Mr. Henderson based on the alleged smell of marijuana in the car, where the car came from, nor consent to search given by Ms. Miller; (2) Officers could not attempt to pat-down Mr. Henderson for safety based on allegations

that the car turned off a street known for drug activity, Mr. Henderson's behavior during the traffic stop, nor the faint odor of marijuana coming from the vehicle; and (3) There was no reasonable suspicion that Mr. Henderson was engaged in criminal activity, nor that he was armed and dangerous as the officers did not independently nor collectively have information sufficient to satisfy the requirement of reasonable suspicion. Henderson concludes that the evidence should be suppressed, or at a minimum, a new suppression hearing scheduled. To follow Henderson's argument would "artificially isolate [each fact] and mistakenly subvert [the] legitimate totality-of-the-circumstances review" performed by the Magistrate Judge. It appears to the Court that Henderson has taken an overly restrictive and individualistic approach to the analysis of whether reasonable suspicion existed, rather than an aggregate approach which the totality of the circumstances requires.

Defendant also argues that there was no information communicated from Officer Bartlett to Officer Putman, and as a result, the officers could not satisfy the collective knowledge doctrine. The collective knowledge doctrine requires three separate inquiries:

> (1) the officer taking the action must act in objective reliance on the information received; (2) the officer providing the information must have facts supporting the level of suspicion required; and (3) the stop must be no more intrusive than would have been permissible for the officer requesting it.

*United States v. Lyons*, 687 F.3d 754, 767 (6th Cir. 2012) (citations omitted). However, the collective knowledge doctrine is inapposite to the facts of this case.

The seminal cases establishing the collecting knowledge doctrine are *Whiteley v. Warden, Wyo. State Penitentiary*, 401 U.S. 560 (1971) and *United States v. Hensley*, 469 U.S. 221 (1985). In *Whiteley*, a county sheriff issued a statewide dispatch relaying the arrest warrant for an individual suspected of a burglary. *Whiteley*, 401 U.S. at 563. In *Hensley*, the sole communication between the law enforcement bodies was a flyer issued by the investigating

12

authority. *Hensley*, 469 U.S. at 223. Neither case is analogous to the facts of the instant case, where two police partners are working together at the same stop. Nonetheless, the officers testified that some form of communication was given to notify Officer Putman that Defendant needed to be frisked.

In *United States v. Blair*, 524 F.3d 740, 750-51 (6th Cir. 2008), the Sixth Circuit stated that a high-crime area will not by itself justify a *Terry* stop, but it can be taken into account with other factors. The Sixth Circuit has also held that the mere fact that "drugs and weapons go together" is insufficient to establish reasonable suspicion that a person is armed and dangerous, unless there are other factors that support a reasonable suspicion. *See United States v. Shank*, 543 F.3d 309 (6th Cir. 2008); *see also United States v. Borne*, 239 F. App'x 185,187 (6th Cir. 2007); *United States v. Jacobs*, 377 F.3d 573, 579-80 (6th Cir. 2004) (quoting *United States v. Heath*, 259 F.3d 522, 530 (6th Cir. 2001) ("[O]fficers who stop a person who is "reasonably suspected of carrying drugs" are "entitled to rely on their experience and training in concluding that weapons are frequently used in drug transactions," and to take reasonable measures to protect themselves."). Furthermore, "[n]ervousness—even extreme nervousness—'is an unreliable indicator' of someone's dangerousness, 'especially in the context of a traffic stop.'" *United States v. Noble*, 762 F.3d 509, 522 (6th Cir. 2014) (quoting *United States v. Richardson*, 385 F.3d 625, 630 (6th Cir. 2004)). However, the Supreme Court has "recognized that nervous, evasive behavior is a pertinent **factor** in determining reasonable suspicion." *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000) (emphasis added).

The Magistrate Judge found, in the view of the totality of the circumstances approach, that Officers Putman and Bartlett had a reasonable suspicion to frisk Defendant. Specifically, the Magistrate Judge stated:

Officer Putman detected a faint odor of marijuana emanating from Miller's vehicle; he testified that, in his experience, guns and drugs go together. Officer Bartlett testified that Henderson seemed very nervous while waiting in the passenger seat and that he was fidgeting toward the center console and his waistband. As was explained above, Officer Bartlett did not observably signal to Officer Putman that Henderson was nervous or moving in such a way, but he did communicate to him in some fashion that there was an issue and that Henderson needed to be patted down. The two officers had worked together for two years at the time of the stop, and they were familiar with one another's signals and body language. Thus, Henderson's nervous behavior, constant fidgeting, the location of the vehicle (turning off of a street know for drug activity), and the faint odor of marijuana emanating from the vehicle gave the officers reason to believe that criminal activity could have been afoot and that Henderson could have been armed and dangerous.

(ECF No. 43 at 18-19). After a *de novo* review, the Court also finds that the officers had a reasonable suspicion to frisk Defendant.

## CONCLUSION

For the foregoing reasons, the Court ADOPTS the Magistrate Judge's Report and Recommendation. Defendant's Motion to Suppress, ECF No. 22, is DENIED.

**IT IS SO ORDERED** this the 21st day of February, 2017.

*s/John T. Fowlkes, Jr.*
JOHN T. FOWLKES, JR.
United States District Judge